## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| GLENN ALLEN DAVIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-1327 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of denial of Social Security benefits, each party has filed a motion for summary judgment.[1]  The motions now are ripe for decision.  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Plaintiff's Motion should be **denied** and Defendant's Motion should be **granted**.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff Glenn Davis filed an application with the Social Security

---

[1]    Plaintiff's Motion for Summary Judgment and Supporting Brief [Doc. # 10] ("Plaintiff's Motion"); Defendant's Motion for Summary Judgment and Memorandum in Support [Doc. # 11] ("Defendant's Motion").

Administration ("SSA") on March 24, 2009, seeking disability benefits under Title II and supplemental security income under Title XVI. In both applications, Davis alleged disability beginning October 1, 2007. After being denied benefits initially and on reconsideration, Davis timely requested an administrative hearing before an Administrative Law Judge ("ALJ") to review the decision.

ALJ Joseph Essmyer held a "fast-track" hearing on May 20, 2010,[2] and a full hearing on July 13, 2010.[3] At the full hearing, the ALJ heard testimony from medical expert Daniel W. Hamill, Ph.D., and vocational expert Kay S. Gilreath. Davis appeared *pro se*.

In a decision dated August 5, 2010, the ALJ denied Davis's application for benefits.[4] On January 20, 2011, the SSA's Appeals Council denied Davis's request to review the ALJ's decision, rendering the ALJ's determination final.[5] Davis filed this case on April 4, 2011, seeking judicial review of the Commissioner's denial of his claim for benefits.[6]

---

[2]   R. 50-56 (fast-track hearing transcript).

[3]   R. 25-47 (hearing transcript).

[4]   R. 11-20.

[5]   R. 1-5.

[6]   Complaint [Doc. # 1].

### B.     Factual Background

Plaintiff Davis claims disability due primarily to a cognitive disorder and to neck and back pain.  Davis alleges an onset date of October 1, 2007.  However, the earliest medical evidence in the record is from December 2008.

On December 30, 2008, Davis was admitted to the emergency room at Ben Taub for neck and back injuries after an accident involving an automobile.[7]  Davis stated that, after an argument with his wife, he was tied to the back of a car and dragged.[8]  He was diagnosed with cervical spinal stenosis.  Davis underwent elective surgery for C5-C7 decompressive laminectomies on January 2, 2009.  His surgery went well and he was discharged in good condition, with instructions to avoid strenuous activity and heavy lifting for six weeks.[9]  On January 16, he had the surgery staples removed at Columbia Conroe Regional Medical Center.[10]

On March 14, 2009, Davis was treated at the emergency room Memorial Hermann in The Woodlands for a head contusion after he had fallen and lost

---

[7]     R. 220-46.

[8]     R. 225.  Elsewhere in the record Davis reported that the injuries resulted from an assault by his roommates who stole his dog, then ran over his leg and beat him in the head and neck. R. 309.

[9]     R. 225-26.

[10]    R. 248.

consciousness.[11] EMS workers who were called by Davis's family members reported as follows:

> Patient states he cannot feel anything from his waist down and is unable to move his legs/toes.  Patient smells of alcohol, admits to 4 drinks today.  Prior to transport, EMS witnesses several spontaneous purposeful movements of lower extremities, and patient reacts to needle prick in big toe.  Patient continues to complain of paralysis and numbness.  Enroute [to hospital], patient crosses his feet.[12]

Davis was transported to Memorial Hermann, where he was noted by medical staff to be intoxicated.  He was discharged the same day with instructions to take ibuprofin as needed for pain and Skelaxin as needed for muscle spasms.[13]

In May 2009, James Wright, M.D., conducted an assessment of Davis's physical Residual Functional Capacity ("RFC").[14]  He noted some exertional limitations, but  no postural, manipulative, visual, communicative, or environmental limitations.  He reviewed records from Davis's medical treatment in January 2009, noting that his discharge condition after the laminectomy was good and that Davis was fully oriented, moved all extremities, and had no paralysis and a steady gait.  He also reviewed records from Davis's emergency room visit in March 2009, noting that

---

[11]    R. 268-89.

[12]    R. 276.

[13]    R. 273.

[14]    R. 290-97.

Davis again had a steady gait and further noting the EMS workers' observations of Davis's purposeful movements despite his complaints of paralysis.[15]  He noted that no limitations were observed during Davis's face-to-face interview with Social Security personnel.[16]  Wright concluded that Davis's alleged limitations "are expected to respond to treatment and will not be disabling for 12 continuous months."[17]

In June 2009, Davis was seen by Linda Rayha, Ph.D., for a psychological evaluation.[18]  Davis reported to Dr. Rayha that he had suffered a stroke in 2003, that he had undergone spinal surgery in January 2009, and that he had been seen recently at an emergency room for a loss of consciousness.[19]  He complained that he lacked feeling in his hands, could not turn his head, and had weakness in his legs.  He further stated that he had "never" had problems with drugs or alcohol.[20]  Dr. Rayha noted "moderate ambulatory and motor problems" with impaired gait, vision problems, inability to read,  moderate depression and suicidal ideation, poor short-term memory,

---

[15]     R. 297.

[16]     R. 209.  *See* R. 155-57 (in face-to-face interview at SSA Field Office on April 9, 2009, interviewer observed that Davis had no difficulties in any areas, including reading, concentrating, sitting, standing, seeing, using hands, and walking).

[17]     R. 297.

[18]     R. 298-303.

[19]     R. 299.

[20]     R. 299-300.

sporadic concentration, and poor insight and abstracting ability.[21]  She assessed Davis with a verbal IQ of 60 and a full scale IQ of 58, placing him in the mentally deficient range of intellectual functioning.[22]  She diagnosed Davis with vascular dementia, noting that his adaptive functioning was "severely impaired" and that his prognosis was "guarded, even after resuming medical treatment."[23]  She recommended that, if Davis were awarded benefits, his benefits be managed by a caseworker or an agency.[24]

In August 2009, Davis's case was referred for a fraud investigation due to inconsistencies in the record.[25]  On August 24, 2009, investigators made an unannounced visit to Davis's residence, a trailer, and told Davis that they were conducting an investigation regarding a matter in which Davis could possibly be a victim.  Davis answered the investigators' questions regarding his identity, his financial situation, and his work history.  Davis stated that his roommates had assaulted him earlier in the year and had broken his neck after they stole Davis's dog and he chased them on foot.  Davis showed the investigators his neck scar and said the

---

[21]     R. 300-301.

[22]     R. 301-02.

[23]     R. 303.

[24]     *Id.*

[25]     R. 306-311.

roommates had run over his leg and beat his head and neck.  He told the investigators that he was unable to work and was applying for disability benefits.  Davis stated that he rented out rooms in his trailer home and had two roommates, and that the rent was his only source of income.  The investigators then showed Davis a photographic line-up from the phony investigation, and presented him with a form.  The investigators' report states, "I asked [Davis] to read the form aloud and initial and sign in the proper places.  Davis read the form and he signed it in the proper spaces provided."[26]  They observed that Davis had a scar on his neck but had "substantial range of movement in his neck," "did not appear to be in any pain," "walked unsupported with a normal gait," did not show "any signs of having a stroke," and "was able to follow the conversation and answer [the investigators'] questions with intelligent answers."[27]

On September 16, 2009, Davis's applications for disability and SSI benefits were denied.  The decision took into account Dr. Rayha's assessment, among other things, and stated that Davis's impairments were not expected to persist for twelve

---

[26]     R. 310.

[27]     *Id.*

months.[28]  In November, upon reconsideration, denial of benefits was affirmed.[29]

On May 20, 2010, Davis's case was heard by the ALJ at a "fast-track" hearing. Davis testified that he had not seen a doctor recently because he could not afford the appointment.[30]  Given the absence of recent medical evidence and the inconsistencies in the record, the ALJ decided to send Davis for a consultative examination at the SSA's expense.  He explained to Davis that, after the examination, a second, full administrative hearing would be held.[31]

On June 9, 2010, Davis was seen for a consultative examination by John Anigbogu, M.D..[32]  Davis reported that he continued to have "constant stabbing pain" in his neck, radiating to his shoulders and forearms, and that he lacked feeling in his distal extremities.  He further reported that he had suffered a stroke on March 8, 2010, involving his left side, that he had been hospitalized at Conroe Regional Hospital for three days, and that since the stroke his tremors had worsened in his extremities and

---

[28]    R. 63-70.  *See* R. 312-25 (Psychiatric Review Technique by Jean Germain, Ph.D., dated Sept. 10, 2009, noted that Davis had a diagnosis of dementia but that cumulative evidence in the file, including the fraud investigation, did not support the diagnosis).

[29]    R. 71-76; R. 330-31.

[30]    R. 52.

[31]    R. 54-55.

[32]    R. 333-42.

that he "no longer tries getting out of his wheelchair."[33]  He further reported intermittent chest pain since 2003, dyslexia, and other conditions.  He denied alcohol or drug use.[34]  Dr. Anigbogu stated that Davis "needed assistance with in bed mobility, transfers and dressing," and that when Davis "attempted to ambulate," his "gait was ataxic and very unsteady."[35]  Diagnostic imaging of Davis's spine revealed "mild to moderate degenerative disease."[36]  Dr. Anigbogu stated that Davis could sit for seven hours per day but could not stand or walk more than 30 minutes, and that Davis's use of a cane was medically necessary.  He assessed significant limitations in Davis's ability to lift or carry, stated that his use of his hands and feet was somewhat limited, and noted various postural and environmental limitations.  He stated that the limitations were first present in December 2008, the time of Davis's neck injury, and that they would last for twelve consecutive months.[37]

On July 13, 2010, the ALJ held a full hearing.  Davis testified that he had

---

[33]   R. 333.  The Court notes that there is no medical evidence in the record reflecting a stroke at any time, nor is there any record of hospitalization or medical treatment in March 2010.

[34]   R. 333-34.

[35]   R. 335.

[36]   R. 336.

[37]   R. 342.

stopped working in 2007 because he was "going to retire."[38]  He stated that he was able to care for himself but that he needed help with "certain things" because he could not read and write and could barely sign his name.[39]  He testified that he completed tenth grade and had attended special education classes.[40]  He had worked as a heavy equipment operator and was able to read street signs "with what street knowledge I've got."[41]  He testified that he still had his driver's license but no longer drove, stating there was "really no reason" except that he preferred not to drive.[42]  He stated that he was not receiving mental treatment because he did not have insurance.[43]  He testified that he was currently unable to work because of neck pain which prevented him from picking anything up, and which kept him from sitting more than ten minutes or standing more than twenty minutes.[44]  He testified that he could walk as far as his mailbox, and that he sometimes used a cane and wheelchair but that neither was

---

[38]     R. 33-34.

[39]     R. 34-35.

[40]     R. 32.

[41]     R. 36.

[42]     R. 36-37.

[43]     R. 38.

[44]     R. 38-40.

prescribed by a doctor.[45]  He testified that he had "constant" pain and numbness in his fingers.[46]

Medical expert Dan Hamill opined that, based on the medical record and Davis's testimony, Davis should be limited to simple tasks that were detailed but not complex, and should not have a position that requires reading for meaning.  He stated that, with these limitations, there was no objective evidence that Davis could not work a forty-hour week.[47]  The ALJ presented the vocational expert, Kate Gillrey, with a question involving the abilities of a hypothetical person with the same age, educational level and work experience as Davis; who was limited to detailed or simple tasks with no forced or assembly line pace and no reading for meaning; who not limited in sitting but was limited in standing to 30 minutes and in walking to 30 minutes, and who required a cane for walking; who was incapable of pushing or pulling, climbing, kneeling, crouching, or crawling, and could perform only occasional balancing or stooping; who could not operate a motor vehicle or be exposed to moving machinery, unprotected heights, or vibrations, and could tolerate

---

[45]     R. 40.

[46]     R. 41.

[47]     R. 42-43.

only occasional exposure to humidity, wetness, fumes, and extreme heat and  cold.[48]

Gillrey testified that such a person could not perform Davis's past relevant work as

a delivery driver, but would be capable of performing other jobs that existed in the

national economy, such as jewelry preparer, optical goods worker, or ticket seller.

She stated that none of these positions require reading for meaning.[49]

Following the hearing, the ALJ issued a written opinion that Davis was not

disabled, and denied benefits.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who

fails to make a sufficient showing of the existence of an element essential to the

party's case, and on which that party will bear the burden at trial.[50]  "The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."[51]  "An

---

[48]    R. 44-45.

[49]    R. 46.

[50]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d
        1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers
        Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[51]    FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*,
        529 F.3d 335, 339 (5th Cir. 2008).

issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[52]

## III.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole, and second, whether the Commissioner applied the proper legal standards to evaluate the evidence.[53]  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[54]  It is more than a mere scintilla and less than a preponderance.[55]

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present.[56]  In determining whether substantial evidence of disability exists, the court weighs four factors: (1)

---

[52]   *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[53]   *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

[54]   *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[55]   *Id.*; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[56]   *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.[57]  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[58]  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.[59]  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.[60]  In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve.[61]

## IV.  ANALYSIS

### A.  Statutory Basis for Benefits

Davis applied for both Social Security disability insurance and Supplemental Security Income (SSI) benefits.  Social Security disability insurance benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement,

---

[57]  *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).

[58]  *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

[59]  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[60]  *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.

[61]  *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

provided they are both insured[62] *and* disabled,[63] regardless of indigence.

SSI benefits are authorized by Title XVI of the Social Security Act, and provides an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line.[64]  Eligibility for SSI is based on proof of disability[65] and indigence.[66]  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled.[67]  Thus, the month following an application fixes the earliest date from which SSI benefits can be paid. Eligibility for SSI, however, is not dependent on insured status.

Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act, which defines disability in virtually identical language.  Under both provisions, "disability" is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

---

[62]  42 U.S.C. § 423(c) (definition of insured status).

[63]  42 U.S.C. § 423(d) (definition of disability).

[64]  20 C.F.R. § 416.110.

[65]  42 U.S.C. § 1382c(a)(3) (definition of disability).

[66]  42 U.S.C. §§ 1382(a) (financial requirements).

[67]  *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335.

can be expected to last for a continuous period of not less than twelve months."[68]  The law and regulations governing the determination of disability are the same for both programs.[69]

### B.   Determination of Disability

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work.[70]  The claimant has the burden to prove disability under the first four steps.[71]  If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful

---

[68]     42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(3)(A) (SSI).

[69]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[70]     *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.  The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations.  *Perez*, 415 F.3d at 461-62.  The Commissioner assesses the RFC before proceeding from Step Three to Step Four.  *Id*.

[71]     *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619.

employment that is available in the national economy.[72]  Once the Commissioner

makes this showing, the burden shifts back to the claimant to rebut the finding.[73]  A

finding that a claimant is disabled or is not disabled at any point in the five-step

review is conclusive and terminates the analysis.[74]

    In this case, at Step One, the ALJ determined that Davis had not engaged in

substantial gainful activity since his alleged onset date of October 1, 2007.[75]  The ALJ

found at Step Two that Davis had three severe impairments: status post decompressive

laminectomies of the C5, C6, and C7 vertebrae; degenerative disc disease of the

cervical spine; and cognitive disorder, not otherwise specified.  At Step Three, the

ALJ concluded that Davis's impairments, considered singly or in combination, did not

meet or medically equal a listed impairment in the relevant federal regulations.

    Before proceeding to Step Four, the ALJ assessed Davis's residual functional

capacity ("RFC") as follows:

> [T]he claimant has the [RFC] to perform sedentary work as defined in 20
> C.F.R. 404.1567(a) and 416.967(a), except that he is limited to only
> occasional balancing; can have only occasional exposure to extreme heat
> or extreme cold; his ability to stoop is limited to no more than is required
> to sit in a chair and perform work tasks.  In addition, he cannot perform

---

[72]    *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.

[73]    *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.

[74]    *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

[75]    Davis meets the insured status requirements of the SSA through March 30, 2011.

> kneeling, crouching, or crawling; can have no exposure to unprotected heights or moving machinery; cannot operate motor vehicles; and, cannot climb stairs, ropes, scaffolding, and ladders. The claimant can perform detailed or simple tasks but not complex tasks. He cannot read for meaning, perform work at a forced pace, or meet quota requirements.[76]

At Step Four, the ALJ determined that Davis was unable to perform his past relevant work as a heavy equipment operator or delivery driver. At Step Five, he determined that jobs exist in significant numbers in the national economy that Davis could perform, including jewelry preparer, optical goods worker, and ticket seller. Therefore, the ALJ concluded that Davis was not under a disability from October 1, 2007, through August 5, 2010, the date of decision.

### C.   <u>Plaintiff's Arguments for Reversal</u>

#### 1.   **Cognitive Disorder Listing (12.05B)**

Plaintiff Davis argues that the ALJ erred at Step Three when he found that Plaintiff does not meet the requirements for Listing 12.05B pertaining to mental retardation.

Listing 12.05B pertains to mental retardation and provides that "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;

---

[76]   R. 15.

i.e., the evidence demonstrates or supports onset of the impairment before age 22."[77]

The listing further provides that "the required level of severity for this disorder is met" when the patient has a "valid verbal, performance, or full scale IQ of 59 or less."[78]

Davis argues that Listing 12.05B is met because his full scale IQ was placed at 58, within the mentally deficient range, on June 3, 2009.[79] However, Davis points to no evidence in the record, and in fact fails even to assert, that he suffered from the impairment before age 22, as required by the text of the listing. On this ground alone, Davis's argument fails.[80]

Moreover, Davis fails to discuss the ME's testimony at the administrative hearing that Davis's diagnosis of cognitive disorder, not otherwise specified, did not meet Listing 12.05.[81] The ALJ credited the ME's testimony, noting that it was consistent with the record and giving it "great weight."[82] The ALJ specifically discussed the IQ score cited by Davis, but noted that "the medical evidence does not

---

[77]     20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

[78]     *Id*. § 12.05B.

[79]     R. 299-303.

[80]     *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet **all** of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify") (emphasis original).

[81]     R. 42.

[82]     R. 17.

substantiate any objective diagnostic testing to confirm [Dr. Rayha's] diagnosis [of

vascular dementia]."[83]   The ALJ also cited to the CDI investigation and claimant's

ability to answer the investigators' questions intelligently, and concluded "[i]t appears

that the claimant has been less than truthful in the information he has provided during

the course of this disability application process."[84]   The ME's testimony, as well as the

investigative findings which severely undercut Davis's claims of mental impairment,

provide substantial evidence supporting the ALJ's decision regarding Listing 12.05B.

Because the ALJ's determination is supported by substantial evidence, it must be

affirmed.[85]

### 2.      Back Impairment Listing (1.04A)

Davis argues that he meets the Listing 1.04A for disorders of the spine, and that

the ALJ erred when holding to the contrary at Step Three.  Listing 1.04A pertains to:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease,
> facet arthritis, vertebral fracture), resulting in compromise of a nerve root
> (including the cauda equina) or the spinal cord. With . . . [e]vidence of
> nerve root compression characterized by neuro-anatomic distribution of
> pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of the lower back,

---

[83]      *Id.*

[84]      *Id.*

[85]      *See Perez*, 415 F.3d at 461.

positive straight-leg raising test (sitting and supine).[86]

Davis argues that, "[a]t all times since [his] alleged onset date [of October 1, 2007] he has complained of significant pain in his back, has noted that his pain is worsened with activity, and has been unable to ambulate normally even with the use of assistive devices."[87]   Davis points to his back injury in December 2008 and subsequent surgery in January 2009, as well as his emergency room treatment in March 2009.  Davis also cites to his consultative examination on June 9, 2010, by Dr. Anigbogu, in which he complained of neck pain, loss of feeling in his extremities, loss of balance, and said he was rarely able to get up from his wheelchair.  He states that the consultative exam by Dr. Rayha in June 2009 corroborated his inability to sit for extended periods and to rotate his head normally, his impaired gait, and his severe tremor in his left hand.  Davis alleges that his problems persist, citing to portions of the record that rely on Davis's own account of his symptoms.[88]  He does not mention the CDI investigation in August 2009.  He requests remand for proper evaluation at Step Three.

The ALJ determined that the criteria for Listing 1.04A was not supported by

---

[86]     20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

[87]     Plaintiff's Motion, at 5.

[88]     Plaintiff's Motion, at 7-8.  Davis cites heavily to his hearing testimony and to information on forms submitted to the SSA, with some citation to Dr. Rayha's report. He also cites to an SSA claims representative who noted in November 2009 that Davis walked with a limp and appeared to be in pain.  R. 176.

objective medical evidence in Davis's record.[89]  The ALJ further found that, despite

Davis's claims, there was no medical evidence in the file that substantiated any

treatment for stroke, chest pain, or left upper extremity pain.[90]  The ALJ discussed

Davis's diagnosis of cervical spinal stenosis in December 2008, but noted that Davis

was ambulating independently in January 2009.[91]  When Davis fell and was taken to

an emergency room in March 2009, he was found to be intoxicated but his physical

examination was normal with no evidence of muscle spasm or decreased range of

motion.[92]  Diagnostic imaging at the time also revealed only mild to moderate

impairment.[93]  The ALJ further noted that Davis had received no medical treatment

since March 2009, although he had a consultative examination ordered by the ALJ in

June 2010 with Dr. Anigbogu.  At that examination, the ALJ noted, Davis endorsed

symptoms including muscle tenderness, decreased range of motion, and decreased

sensation in his extremities, and exhibited an unsteady gait.  Dr. Anigbogu noted that

Davis required a cane, but the ALJ noted that no assistive device had ever been

---

[89]     R. 14.

[90]     R. 16.

[91]     *Id.* (citing R. 254).

[92]     *Id.* (citing R. 270-71).

[93]     *Id.* (citing R. 283-86).

prescribed to him.[94]  In August 2009, when visited by CDI investigators, Davis had

exhibited normal gait and substantial range of motion, and did not appear to be in

pain.  Based on the entire record, the ALJ concluded that Davis's statements regarding

his alleged impairments were not fully credible.[95]

The ALJ's findings regarding Davis's credibility are supported by substantial

evidence.  Likewise, his conclusion that Davis did not meet the criteria for Listing

1.04A is supported by substantial evidence given the absence of objective medical

evidence supporting his alleged symptoms, his condition at the time of the CDI

investigation, and the findings regarding his credibility. Summary judgment is granted

for Defendant.

### 3.    Mental RFC

Davis argues that the ALJ improperly determined his mental RFC when he

relied upon the opinion of the ME, a non-examining physician, despite the fact that

the ME's opinion was inconsistent with that of Dr. Rayha, who did examine Davis.

The ALJ's opinion assessed Davis's mental RFC as follows:

> The claimant can perform detailed or simple tasks but not complex tasks.
> He cannot read for meaning, perform work at a forced pace, or meet

---

[94]    *Id.*

[95]    R. 15-17.

quota requirements.[96]

This assessment tracked the ME's opinion.[97]   The ALJ concluded that the ME's opinion was consistent with the record, persuasive, and entitled to great weight.[98] Davis argues that the ME's opinion is inconsistent with "ample objective and subjective record evidence," including Dr. Rayha's assessment, and that an ALJ may rely on a non-examining physician's opinion "only if it [is] supported by substantial evidence and is not contradicted by an examining physician's opinion."[99]   Davis also cites to parts of the record that he says support his claims of mental impairment.[100]

Davis relies on *Villa v. Sullivan*, which states that reports of non-examining physicians "do not provide substantial evidence as a matter of law" when the non-examining physician "makes specific medical conclusions that either contradict or are

---

[96]   R. 15.

[97]   *See* R. 42-43 ("[P]er the written record, I don't think the claimant would succeed at any kind of complex task.  I don't think he'd succeed at any kind of forced or assembly line pace.  That's per the written record.  Per testimony, he should not have a job requiring reading for meaning. . . . I'd limit him to simple and detailed [tasks] . . . . [b]ut not complex.").

[98]   R. 17.

[99]   Plaintiff's Motion, at 9 (citing *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990)).

[100]   Plaintiff's Motion, at 10-11 (citing to Davis's hearing testimony, self-reported information on SSA forms, and Dr. Rayha's report).

unsupported by findings made by an examining physician."[101]  In this case, however, the substantial evidence supporting the ALJ's RFC assessment was not solely the ME's opinion, but also consisted of Davis's medical records and the CDI investigation, during which Davis was able to follow conversation and give "intelligent answers" to the investigators' questions.[102]  This evidence was in conflict with Dr. Rayha's assessment.   Although the ALJ considered the IQ testing administered by Dr. Rayha, he concluded that "the medical evidence does not substantiate any objective diagnostic testing to confirm [Dr. Rayha's] diagnosis [of vascular dementia]."[103]   As noted previously, Davis does not discuss the CDI investigation and offers no explanation for the disparity between the investigators' findings and Dr. Rayha's assessment.  Dr. Rayha's conclusions necessarily were based largely on Davis's own subjective reporting[104] and, as noted above, the ALJ found Davis less than fully credible.  Even in the case of a "treating physician"—which Dr. Rayha was not—the physician's opinion is entitled to "controlling weight" *only* when it is "well-supported by medically acceptable clinical and laboratory diagnostic

---

[101]   *Villa*, 895 F.2d at 1024 (citing *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[102]   R. 17.

[103]   R. 17.

[104]   R. 299 (Rayha's report states that Davis "provided all the information gathered for this report").

techniques and not inconsistent with other substantial evidence."[105]  Given the record in this case, the ALJ did not err by assigning greater weight to the ME's opinion than to the opinion of Dr. Rayha.

The ALJ's assessment of Davis's mental RFC is supported by substantial evidence and is affirmed.[106]

### 4.    Physical RFC

Davis argues that the ALJ's physical RFC assessment was improperly determined and is inconsistent with the opinion of Dr. Anigbogu, who performed a consultative examination in June 2010 between the fast-track and full administrative hearings.  The ALJ assessed the following physical RFC for Davis:

> After careful consideration of the entire record, I find that the claimant has the [RFC] to perform sedentary work . . . , except that he is limited to only occasional balancing; can have only occasional exposure to extreme heat or extreme cold; his ability to stoop is limited to no more than is required to sit in a chair and perform work tasks.  In addition, he cannot perform kneeling, crouching, or crawling; can have no exposure to unprotected heights or moving machinery; cannot operate motor vehicles; and, cannot climb stairs, ropes, scaffolding, and ladders.[107]

Dr. Anigbogu had stated that, among other things, Davis was limited in his ability to lift and carry; that he could stand or walk for only thirty minutes per day; that he could

---

[105]    *Newton*, 209 F.3d at 455 (internal quotation marks, citations, and alteration omitted).

[106]    *See Perez*, 415 F.3d at 461.

[107]    R. 15.

sit for seven uninterrupted hours per day; that he required a cane to ambulate; and that he lacked feelings in his hands and was limited in his ability to push and pull with his hands.[108]

Plaintiff first argues that "nowhere in the ALJ's decision does he mention Dr. Anigbogu's assessment, indicating that he simply chose to ignore this important evidence," and that the ALJ may not pick and choose through the evidence.[109]  In fact, however, the ALJ specifically discussed Dr. Anigbogu's examination.[110]  Davis's argument is meritless.

Plaintiff also argues that the ALJ's physical RFC assessment is flawed because it is "wholly inconsistent" with Dr. Anigbogu's assessment.  Although Davis's briefing engaged in a lengthy recitation of Dr. Anigbogu's opinions and Davis's medical records,[111] it fails to identify any specific limitation that is endorsed by Dr. Anigbogu but not accommodated in the ALJ's RFC assessment.  For example, although Davis correctly notes that Dr. Anigbogu stated that Davis needs a cane to ambulate, such a limitation is accommodated in the RFC assessment of sedentary work and, in fact, Dr. Anigbogu stated that Davis was capable of sitting for seven

---

[108]     R. 337-42.

[109]     Plaintiff's Motion, at 12 (citing cases).

[110]     R. 16.

[111]     Plaintiff's Motion, at 11-12, 13-14.

uninterrupted hours in an eight-hour workday.[112]  In fact, the ALJ's assessment is in

substantial agreement with Dr. Anigbogu, and Davis fails to identify any material

difference, much less how the purported difference would affect Davis's ability to do

sedentary work.

The ALJ's physical RFC determination is supported by substantial evidence.

### 5.    Ability to Afford Medical Treatment

Davis argues that the ALJ improperly failed to consider his inability to afford

medical treatment, stating that Plaintiff had "repeatedly asserted" his inability to pay

for treatment during his administrative hearing, in his application materials, and to his

physicians.[113]  If a claimant cannot afford treatment and can find no way to obtain it,

a condition that is disabling in fact becomes disabling in law.[114]

The record in this case reflects that, despite his financial situation, Davis was

able to obtain medical care after his accident in December 2008, and again after his

fall in March 2009.   Davis's briefing does not identify any particular medical

---

[112]   R. 338.  Davis also takes issue with the ALJ's finding that Davis's ability to stoop is
"limited to no more than is required to sit in a chair and perform work tasks," R. 15,
because Dr. Anigbogu checked a box indicating that Davis could never stoop. R. 340.
This is a distinction without a difference.  The ALJ's determination that Davis was
capable of sitting for work is in fact in agreement with Dr. Anigbogu's opinion that
Davis was capable of sitting for seven uninterrupted hours.  R. 338.

[113]   R. 15.

[114]   *Lovelace v Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

condition for which Davis was unable to obtain medical treatment and that renders him disabled.[115]  Given Davis's vague argument and the lack of record evidence to support it, *Lovelace* does not warrant remand in this case.[116]

### 6.    Step Five Finding

Davis argues that the ALJ erred at Step Five when he found that Davis could perform certain sedentary jobs that existed in the national economy.  At Step Five, the Commissioner bears the burden of proof to show that the claimant can perform the relevant jobs; if the Commissioner does so, the burden shifts back to the claimant to rebut the Commissioner's showing.[117]

Davis argues that the Step Five finding is flawed because the ALJ did not properly give effect to Davis's difficulties with reading and writing.  The RFC assessed by the ALJ provided that Davis could not read for meaning.  At the administrative hearing, the ALJ asked the VE hypothetical questions based on numerous limitations, including an inability to read for meaning, and the VE identified three positions for which such a person could meet the requirements: jewelry preparer,

---

[115]     Plaintiff's Motion, at 15-16.

[116]     *See Villa*, 895 F.2d at 1024 (*Lovelace* is not controlling "because there is no record evidence, besides Villa's testimony, that he would be disabled with or without regular medical treatment"); *Tamez v. Sullivan*, 888 F.2d 334, 336 (5th Cir. 1989) ("[t]he record contains no evidence, however, that Tamez' diabetes is disabling on account of an inability to pay for treatment"),

[117]     *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

ticket seller, and optical goods worker.[118]   The VE specifically testified, upon a

question from the ALJ, that all three positions could be performed without reading for

meaning.[119]   Davis protests that these three positions all require some reading, citing

to the Dictionary of Occupational Titles.[120]   He states that the record supports his

inability to read at all.

The ALJ considered Davis's testimony that he could not read and write, but

credited the investigative report in which the investigator stated that, when asked to

read a form aloud, Davis read the form and signed in the proper place.[121]   The ALJ

restricted Davis to positions that do not require reading for meaning.   All evidence

cited by Davis in support of more severe restrictions on his reading ability is based on

Plaintiff's self-reporting, and is contradicted by the investigator's report.[122]   As noted

---

[118]   R. 45-46.

[119]   R. 46.

[120]   Plaintiff's Motion, at 17.  For example, Plaintiff cites the Dictionary of Occupational
Titles as providing that the jewelry preparer position requires the ability to recognize
the meaning of 2,500 two or three syllable words, read at a rate of 95-120 words per
minute, compare similarities and differences between words and between series of
numbers, and print simple sentences containing subject, verb, and object, and series
of numbers, names, and addresses.  *Id.*

[121]   R. 16-17 (citing CDI investigation); *see* R. 310 (investigator stated he asked Davis to
read a form aloud, and that Davis "read the form and signed it in the proper spaces
provided").

[122]   *See* Plaintiff's Motion, at 16 (citing record).  Plaintiff cites exclusively to parts of the
record that rely on his self-reporting, including his hearing testimony and Dr. Rayha's
(continued...)

above, Davis's briefing does not discuss the investigator's report at all, and the ALJ made credibility findings that are supported by substantial evidence.[123]

The ALJ's assessment of Davis's reading ability is supported by substantial evidence, including the VE's testimony and the investigative report, and the Commissioner has met his Step Five burden.  Davis has not adequately rebutted the evidence regarding his ability to perform the jobs identified by the ALJ.  Summary judgment is granted for Defendant.

## V.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment and Supporting Brief [Doc. # 10] is **DENIED**.  It is further

**ORDERED** that Defendant's Motion for Summary Judgment and Memorandum in Support [Doc. # 11] is **GRANTED**.

A separate final judgment will issue.

---

[122]    (...continued)
report.

[123]    Davis additionally asserts that the ALJ erred at Step Five because he failed to accommodate his visual limitations and his inability to feel with his hands, citing to the reports of Drs. Rayha and Anigbogu. Plaintiff's Motion, at 16-17. These citations again rely heavily on Davis's self-reporting, and were squarely contradicted by the investigators' findings.  Moreover, although Dr. Anigbogu opined that Davis could not feel with his hands, he stated that Davis was capable of frequent reaching, handling, and fingering with both hands.  R. 339.

**SIGNED** at Houston, Texas, this 15<u>th</u> day of **February, 2012.**

Nancy F. Atlas
United States District Judge